# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT INFORMAL BRIEF FOR HABEAS AND SECTION 2255 CASES

No. 24-6743,    US v. Demetrios Stavrakis
               1:19-cr-00160-ELH-1, 1:23-cv-02058-ELH

**DEMETRIOS STAVRAKIS**
Appellant,
v.
**UNITED STATES OF AMERICA**,
Appellee.

**INFORMAL BRIEF**
Appellant hereby submits this Informal Brief pursuant to Local Rules 22(a) and 34(b) in support of his appeal of the final order by the United States District Court for the District of Maryland denying Appellant's motion to vacate pursuant to 18 U.S.C. Section 2255 (ECF 406 "Section 2255 motion") and request for leave to conduct discovery (ECF 425 "Discovery Request") entered on July 3, 2024. (See ECF 439 "Order", Civil No. ELH-23-2058, Criminal No. ELH-19-0160.)  The district court declined to issue a certificate of appealability.  This brief substantially follows the form prescribed by this Court.

**ISSUES ON APPEAL**
**ISSUE ONE.** PROSECUTORIAL MISCONDUCT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF THE LAW
     Appellant raised in his Section 2255 motion a number of claims of prosecutorial misconduct, and which each claim alone or in some combination so infected the trial with unfairness as to make the resulting conviction a denial of due process.

     A.  During the government's case-in-chief prosecutor Mihok called as its witness EMT/firefighter Anthony Cianferano. Mr. Cianferano worked that morning and was at the scene of the fire.  In order to ventilate the smoke from the building, he was tasked with going through the building and opening the doors. As Mr. Cianferano made his way from the warehouse portion of Adcor into the office area, his image was captured on video by the front-office door surveillance camera.  The video depicts him opening the front office door without depressing the latch on the magnetic lock, which established for the government that the masking tape placed over the spring-loaded (Brivo) latch was still in place. (Tr. Vol. 7, at 172.)
     However, prosecutor Mihok's questioning of the witness arose to serious misconduct because he knew Mr. Cianferano would lie when asked, "[and] when you got to the door, do you recall how the door opened?" and would answer "I just pushed and it opened real easy." (Tr. Vol. 7, at 154-55.)  The purpose of this false testimony was to establish that the front office door was unlocked and thus must have been the arsonist's point-of-entry.  But this testimony stands in opposition to the facts that the government had available prior to the start of the trial.

During the frame-by-frame playback of the front-office door surveillance video Mr. Cianferano is depicted with his arm by the deadbolt. (Tr. Vol. 7, at 172.) Show this frame Mr. Cianferano describes that he is pushing the door. (Id.) However, as the video is advanced by one frame (a gap of three seconds is noted between the frames of video), and the door appears only slightly ajar. (Id.)

Aside from the fact that it is inexplicable as to why it took Mr. Cianferano three seconds to open the door that he states was "real easy" to do so by "just push[ing]" it, the video is completely ambiguous. One cannot determine from the video, because of the three second interval between the two frames in question, whether Mr. Cianferano did or did not turn the deadbolt latch prior to opening the front office door.

However, the brown masking tape Mr. Stavrakis placed over the Brivo latch to arm the security system, that the government attempts to prove, through testimony and photographic evidence, to have been removed from the door later that morning of the fire, can in fact be found to be lying off to the side of the front entryway a couple of inches from the base of the right-hand side, front office door. (See Gov. Exhibit A-1.) In the photograph the door is seen propped as far right as it can be opened. The masking tape, which was used to hold depressed the Brivo latch came to lay right next to the door. Much farther to the right of the position where one entering the front office could open the door without having take a step off to the right. Thus, from where the masking tape came to lay one may only conclude that when Firefighter Cianferano opened the front office door, that was the first time anyone had opened the front office door since Mr. Stavrakis locked up earlier that night. Therefore, the arsonist could not have entered through the front office door, and Mr. Cianferano lied to the jury when he testified that the door was unlocked.

Furthermore, Mr. Cianferano is contradicted by his own testimony (and that of ATF Special Agent Herb). Under direct examination he testified that when he arrived to the scene of the fire, other than the door Captain Smith had pried open, that at that time no other exterior door door was open. (Tr. Vol. 7, at 148.) After the fire was put out and Mr. Cianferano finished his task to ventilate the building, he was told to wait for the fire investigator for the Fire Investigation Bureau (FIB). (Tr. Vol. 7, at 157.) Contrary to both his order and his duty as a fireman to report anything suspicious to the FIB (Tr. Vol. 19, at 204-05, and Vol. 7, at 141-420, such as finding open the front door to a business after operating hours, Mr. Cianferano did not report the "open" door to the FIB fire investigator Lieutenant Heather Cate. (Tr. Vol. 7, at 157.) Nor did he report it to anyone else including Task Force Officer Dexter Hodges in an interview nine months after the fire.

In fact, government witness ATF SA Lisa Herb learned from FIB fire investigator Lieutenant Cate, who was on the scene to determine origin and cause, that:

> "There was no forced entry that the fire department observed upon arrival. They actually had to get inside the structure by cutting a hole in one of the bay doors, as well as taking their crow bar or halligan tool and popping the door to be able to enter into the warehouse. The warehouse was reported to be secure."
> (Tr. Vol. 5, at 55:16 - 56:1.)

Proper adjudication of this claim requires additional evidentiary development. (See Discovery Request.)

  B.  For the purpose of creating a motive to destroy the hard disk drives containing the original surveillance camera footage, and thereby falsely establishing guilty knowledge of and intent for the arson, prosecutor Mihok called Detective Michael Reno to the stand to lie to the jury, by having him testify that he saw surveillance camera footage of the arsonist lighting the fire at the DNC Hut, located in the middle of the warehouse floor.

  As it was deemed arson Detective Reno of Baltimore Police Department - Arson Unit was called in to work the investigation with fire Lieutenant Cate of the FIB of Baltimore Fire Department. (Tr. Vol. 15, at 142.)  During the investigation, between 4 and 6am the morning of the fire, Detective Reno and Lieutenant Cate reviewed the video surveillance footage of the fire with Michael Hyatt (then the GM of Adcor) at his work space. (Tr. Vol. 15, at 148-49.)  At trial prosecutor Mihok purposefully sought false testimony from Detective Reno by specifically asking him:

> Q.  Back to second floor of the office area, when you were reviewing the video. ...[C]an you describe to the jury the footage you were shown or what you saw that morning? ...
> A.  I asked Mr. Hyatt if I could, the best camera that he had that would look at the area of origin.  He pulled up a camera.  We moved the film back.  As we were watching, I saw a human figure in the shadows walking up to the building, or shack.  Knelt down by the shack, and then moments later you saw the fire and the figure leave the area of origin.

(Tr. Vol. 15, at 151:7-16; notice that in his last sentence the detective depersonalizes his testimony by stating, later "you" saw, rather than, later "I" say, which is a speech pattern indicative of someone lying.)

  According to this testimony the jury was led to believe that the arsonist was captured on camera igniting the methanol that incinerated the DNC Hut, and because said video proved the fire to be an arson (which was never in dispute) motivated someone to destroy the hard disk drives.  Therefore, the jury concluded that the loss of the hard drives was not innocent or inadvertent.

  However, Detective Reno's false testimony is contradicted by the government's evidence and its own theory of the case.  During the playback, Detective Reno had Mr. Hyatt rewind the footage back to when the DNC Hut first caught fire. (Tr. Vol. 15, at 151.)  However, according to surveillance footage from the manual area (see Gov. Exhibit 1) the fire first stared at 1:29:14am. (Tr. Vol. 21, at 23.)  But Reno's testimony is contradicted by the alarm records (Gov. Exhibit 5-C) and the government's closing arguments where prosecutor Budlow argued that the arsonist entered Adcor at 12:25am, got the methanol can, set the DNC Hut on fire, and exited Adcor at 12:33am. (Tr. Vol. 22, at 78:17-21.)  And, prosecutor Budlow goes so far as to say:

> "The fire did not ignite at 1:30[am].  That fire had clearly ... been burning for some time.  And that 12:35[am] is the point of exit." (Tr. Vol. 22, at 78:24 - 79:2.)

  Nowhere in his incident report regarding his investigation of the fire, does Detective Reno mention having seen a video such as the one he described at trial. (Tr. Vol. 15, at 160.)  Also, on August 8, 2016, in a tape recorded meeting (lasting 90 minutes), attended by TFO Hodges and insurance investigator Tijuana Kittrell, at no point during that meeting did Detective

Reno ever mention seeing that video he testified to seeing nor could he recall telling either of them about this video. (Tr. Vo. 15, at 161.)

Regarding ATF SA Herb's report on the fire she sent Detective Reno an email (dated: 7/23/17) asking him to review a draft of the report and to include any details from his day at Adcor so she could include it in her updated report. (Id.)  Nowhere in his response containing a paragraph description of his activities that day of the fire did he write anything about the video that he described in his testimony. (Id.)

This fabricated testimony was opportunistic of the disappearance of the failed hard drives, and used to mislead the jury into believing it was a coverup.  While the focus of the government's examination regarding the whereabouts of the hard drives was extensive, Detective Reno's testimony claiming the footage of the "human figure in the shadows," that otherwise would be innocuous since the fire was obviously an arson, but because it did not appear on the DVD created by Michael Hyatt containing the 24 hours of surveillance footage of the day of the fire, turned the missing hard drives into a 'coverup' issue used to connect the Appellant to the fire.

Proper adjudication of this claim requires additional evidentiary development. (See Discovery Request.)

C.   On redirect examination prosecutor Budlow lied to the jury by suggesting in his questioning of employee Michael Hyatt that a prior arson had occurred at Adcor.  On a motion at pretrial the court ruled that a prior fire that occurred at Adcor, which fire investigators determined not an arson, to be inadmissible and highly prejudicial.  During redirect examination prosecutor Budlow asked Mr. Hyatt:

> Q.  Mr. Levin [defense counsel] asked you questions about prior times when hard drives crashed. Do you recall those questions?
> A.  Yes.
> Q.  And during any of those prior times, did they precede an arson or did they follow immediately after an arson?
> A.  No, they did not.
> Q.  And did any of them follow immediately after an arson where there was a can of flammable liquid found at the spot where the arson started[?] (Tr. Vol. 12, at 112:14-22.)

According to this line of questioning, logically the jury could only have understood that prosecutor Budlow testified that another arson occurred prior to the arson that is the subject of this case.  In fact, juror number one, during deliberations, asked the court:

> "Have there ever been other fires at any of the defendant's businesses (including Adcor), for which an insurance claim was submitted, regardless of outcome?"

(Jury Notes ECF 225, at 11.)  Therefore, the underlying facts asserted by prosecutor Budlow's questions, in addition to being untrue, were highly prejudicial to Mr. Stavrakis's defense and which violated his due process right to an impartial jury and rendered trial fundamentally unfair.

While the district court's interpretation of the question in issue may be correct when analyzed in isolation, as the court did in its Opinion (ECF 440, at 37-38), but when the same

question is repeated with specificity the common understanding is that the second question is asking about another arson that is not the subject of the preceding question. Clearly reasonable jurists could debate whether this claim should have been resolved differently.

      D. In closing during the government's rebuttal argument, prosecutor Mihok, for the purpose of deceiving the jury and in violation of Appellant's due process right to a fair trial, he mischaracterized Mr. Stavrakis's questions to Ed Thomas about the methanol can found in the DNC Hut as "ridiculous," and falsely claimed Mr. Stavrakis's questions were proof of his guilty knowledge of the arson. Prosecutor Mihok argued that:

> "[The morning of the fire] [o]ne of the questions, the defendant asks [Mr. Thomas] a couple of questions. He says was anybody using the methanol in the DNC Hut? And Ed Thomas, that kind of struck him as odd. And the next question, was anybody smoking in the DNC Hut? Those questions show you the defendant knew that the DNC Hut was the area of the fire and that the methanol had been found there. Why is he even asking these questions? They're just sort of ridiculous."

(Tr. Vol. 22, at 108:16-23.) By the fact that the prosecutor employed a transcriptionist throughout trial Mr. Mihok made this argument in bad faith.

      On Wednesday, October 2, 2019, the day before Mr. Thomas testified at trial, during prosecutor Mihok's examination of the government's witness William Kurhmann, he asks:

> Q. [While showing the witness Exhibit 6] ... Does that look like the can that was stored back in that area that you saw in the DNC Hut that morning?
> A. Yes.
> Q. After making these observations, what did you do next?
> A. I think at one point [Detective Reno] asked me to step outside and stay there, that he would be right back for me. I stepped outside and stayed there.
> Q. And what happened when you went outside?
> A. I saw people. I mean people came to me I'm sure Jimmy [Stavrakis] and Mike [Hyatt] came to me. You know, what did I see? What happened? And that's what I told them it looked like.
> Q. So what did you tell--
> A. I want to say something happened in the Hut, the fire in the hut. And at that point I want say Mike [Reno] came out and grabbed me at that point. ...
> Q. Do you recall if you relayed details about the can, seeing the can in the Hut?
> (Mr. Kurhmann asks Mr. Mihok to repeat the question.)
> A. I'll say I did. I don't remember. But I can imagine.)
> (Defense counsel Levin objects to the speculation of Mr. Kurhmann's response. Then Mr. Mihok uses Mr. Kurhmann's grand jury testimony to refresh his recollection.)
> A. Okay. So the first time I came out, I said there--
> A. --There looks [like] an odd can in there.
> ...

> Q. And who did you make that statement to?
> A. It looks like to Jimmy.
> (Tr. Vol. 13, 89:8 - 92:1.) Thus, prior to talking to Ed Thomas, Mr. Stavrakis found out through Bud Kurhmann that the can of methanol was found in the charred remains of the DNC Hut.

On the next day of trial the following testimony came out during Ed Thomas's direct examination:

> Q. When you arrived [the morning of the fire], did you recall seeing other folk from Adcor there?
> A. There were a few people in the parking lot, I believe Jimmy and Mike Hyatt and Bud [Kurhmann], and of course my coworker Greg Finley...
> Q. Were you interviewed right away by anyone associated with law enforcement?
> A. No, I was told to wait. They weren't ready for me, for our conversation yet.
> Q. While you were waiting did you end up having a conversation with Mr. Stavrakis?
> A. Yes, he approached [me and Greg Finley] and asked us a few questions.
> ...
> Q. Tell the Jury about that.
> A. ... Jimmy had come up to us, and of course we said, we're very sorry what is happening here. He said, well does anyone smoke on the shift, or who was smoking or something to that effect. Greg said, I'm the only one that smokes, but you know, I go outside to smoke. Then Jimmy said, well--either who was or was anybody in the hut cleaning parts, you know, using the cleaning fluid for the, you know, cleaning parts.
> (Tr. Vol. 14, at 192:11 - 193:15.)

In his rebuttal, Mr. Mihok characterized Mr. Stavrakis's questions to Ed Thomas as "ridiculous." However, it is obvious that, after finding out from Bud Kurhmann that the can of methanol was found in the burnt DNC Hut, by asking Ed Thomas and Greg Finley, both of whom were working the manufacturing floor the night before, Mr. Stavrakis was trying to find out (a) why the methanol can was in the DNC Hut and (b) how the fire started.

In conclusion, prosecutor Mihok in closing rebuttal falsely imputed to Mr. Stavrakis guilty knowledge of the fair, and such "inference" is contradicted by the testimony that the prosecutor purportedly derives such guilt from. To allow a prosecutor to encourage the jury to draw certain inferences that contradict the evidence would be both improper and unduly prejudicial. The district court's factual rational for its ruling is unclear (ECF 440, at 39), and thus reasonable jurists could debate whether this claim should have resolved differently.

E. Due to prosecutor Budlow's improper arguments made during closing the government violated Mr. Stavrakis's right to a fair trial and prejudiced his defense. In closing, to rebut the defense's theory of revenge as the motive for the fire, prosecutor Budlow argued:

> "Let's talk about 'revenge' because implicit in the defense's argument is there's somebody out to get revenge. They brought in Hattwick to talks about the factors and the reasons people commit arson. And one of those is revenge. ... There is no evidence of it."

(Tr. Vol. 22, at 74:19 - 75:1.) In a disingenuous effort to make his argument Budlow proceeds to describe acts of looting and vandalism:

> "But look at what the evidence is. (Points to Exhibit 5-A) That's the defendant's office? Was there any damage to his office? Was there anything stolen? Look at the guns that were there. They're valuable. So what's their argument? That this mysterious roof ninja entered from the roof, basically walked right by this office, the person they're bent on revenge, where all these flammable items are, all those combustible items. Doesn't write on the wall, doesn't steal anything, doesn't break anything, doesn't set fire to the office."

(Id, at 75:2-10.) Prosecutor Budlow's argument is objectionable in two important regards. First, on this subject there has not been any testimony to support his argument, and second, with the absence of such, Mr. Budlow is testifying to his opinion on the matter of the motive which is a question solely for the jury to decide.

Thus prosecutor Budlow willfully mislead the jury by making the equivocal and irrational argument, based on his personal opinion, that because there was no evidence of vandalism or looting then the arson could not have been motivated by revenge. Prosecutor Budlow made this baseless argument in spite of the fact that at pretrial the court ordered that the defense expert witness Timothy Hattwick, who was received at trial as an expert witness in fire and explosion investigation (Tr. Vol. 19, at 194), may not give his opinion that the arson was more consistent with a motive for revenge rather than profit, as such opinion would be speculative. (8/16/19 Order ECF 136, paragraph 5.)

Mr. Budlow's improper argument did have a prejudicial effect of the decision by the factfinder. Regarding the trial court denial of Mr. Stavrakis's renewed motion for acquittal or new trial, and in its opinion the court found that:

> "[T]he arsonist also proceeded to a relatively unimportant part of the building to ignite the fire. The jury could have concluded that the person motivated by revenge would have proceeded to a more important target area, such as the defendant's office."(ECF 247, at 20, paragraph 1.)

However, this conclusion stands against reason. How could burning some office furniture be more devastating than the fire that did occur? The arsonist set ablaze the DNC Hut, a wooden structure located in the midst of millions of dollars worth of delicate, high precision manufacturing equipment. The fire, which burned for less than one hour, caused damage that exceeded Adcor's policy limit of $15 million dollars, and by one estimate was over $22 million dollars. (Tr. Vol. 22, at 114:16-18.)

Prosecutor Budlow argues there is no evidence of revenge. However, according to the Fire and Explosives Investigation manual 9221-262 (ECF 75-1, at 3) the fire at Adcor fits its description for a revenge fire motivated by personal retaliation. For example:

> "A fire by the revenge motivated offender may be a well planned one-time event in retaliation for some real or perceived injustice that had occurred months or years before the arson; triggered by an argument, a fight, a personal affront or any event perceived by the offender to warrant retaliation (e.g. see witness testimony of Mike Brown); favorite targets include the victim's vehicle, home or personal possessions (Adcor) and materials (can of methanol and the DNC Hut) may be a significant faction in identifying the Offender (a former employee of Adcor)."

The prosecutor in closing for the purpose of deceiving the jury lied by arguing that because there were no acts of looting and vandalism the arson could not have been motivated by revenge when all the evidence was in fact consistent with the definition of a revenge motivated fire.  Again, to allow a prosecutor to encourage the jury to draw certain inferences that contradict the evidence would be both improper and unduly prejudicial.  The district court's rational for its ruling is unclear (ECF 440, at 39), and thus reasonable jurists could debate whether this claim should have resolved differently.

F.  In closing, during the government's rebuttal argument prosecution Mihok lied to the jury and referred to the can of methanol as a "drug" which the jury would understand to mean the highly poisonous, addictive, and illegal street drug meth, short for methamphetamine.  Prosecutor Mihok stated:
> "But right away [the investigator's] suspicions are very aroused about what they're seeing and what they have observed because this methanol drug (sic) is in a place where it really should not be."

(Tr. Vol. 22, at 173:1-4; notice that by placing "(sic)" after "drug" the court reporter informs the reader that the appearance of the word 'drug' in the quoted passage is not a transcription error but in fact literally the prosecutor's own words.)

By having called the methanol a drug, the prosecutor insinuated that there was something sinister related to drug trafficking going on at Adcor, and for the intended effect of creating a bias in the jury against Mr. Stavrakis in violation of his right to an impartial jury and a fair trial.

Proper adjudication of this clam requires additional evidentiary development. (See Discovery Request.)

**ISSUE TWO.**  VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF THE LAW

The trial court committed prejudicial error in violation of Mr. Stavrakis's due process right with respect to Count Three, Wire Fraud, both (1) by denying the defense's motion for acquittal (and renewed motion) finding there was substantial evidence of guilt, and (2) contrary to the defense's objection, by instructing the jury to willful blindness.

It is important to take note that the following factual account was received through testimony from the government's witnesses on direct examination during its case-in-chief, and thus, should be accorded substantive evidentiary value for purposes of the motion for acquittal and the objection to the willful blindness instruction given to the jury.

Mr. Stavrakis hired public adjustor Randolf Goodman to represent Adcor, in preparation, presentation, and adjustment of its insurance policy claim pertaining to the fire. Regarding the

building component of the insurance coverage, Mr. Goodman employed building cost estimator Ed Cameron to estimate the building repair cost. Mr. Cameron in working up the estimate visited Adcor five to six times. (Tr. Vol. 15, at 28.) Tony Vega was his point of contact for every visit (id, at 29), and during those visits Mr. Cameron interacted with Michael Hyatt and Mt. Vega. (Id, at 30.) Throughout the claims process he only interacted with Mr. Stavrakis two or three times, and they never discussed the claim. (Id, at 29.) In that regard Mr. Cameron dealt with Mr. Goodman, and not Mr. Stavrakis, throughout the building repair estimate part of the claims process. (Id, at 29-30.)

  In working up his building repair estimate, when it comes to specialty trades, such as security alarms and surveillance camera systems, Cameron relies on a subcontractor or vendor to submit a proposal. (Id, at 30.) Being that Cameron dealt only with Goodman regarding his work on the claim, he told Goodman what he needed and Goodman contacted Adcor (i.e., Mr. Stavrakis) to get vendor estimates. (Id, at 31.) At a meeting during one of the site visits, Ed Cameron was told by Mr. Hyatt (or Tony Vega) that "the security and surveillance systems were not working, which is the reason why he requested the bid [through Mr. Goodman]." (Id, at 32.) Accordingly Goodman relayed Cameron's request for proposals for new security and surveillance systems to Mr. Stavrakis, which is also supported by the fact that thereafter Mr. Stavrakis told Hyatt to get a quote on a new security System (Tr. Vol. 12, 27, 30), and also because as Hyatt believed all claims related communications may have went through Randy Goodman. (Id, at 33.)

  Naturally Mr. Stavrakis asked Hyatt to get the proposal as it was testified to by a number of Adcor employees that Hyatt handled the security and video surveillance systems. Focused on what was said by Mr. Stavrakis when he asked Hyatt to get the proposal, Prosecutor Budlow asked Mr. Hyatt:

> Q. And do you recall the conversation with the defendant when he asked you about getting a quote? What did he ask you regarding getting a new, integrated system?
> A. He really didn't ask much. He just said see if you can get a quote for a new security system. ...
> Q. And did he say anything at all about what he wanted different or better in this new system?
> A. I don't remember if he did or I did.
> Q. Did he say anything about wanting it to be integrated?
> A. That sounds like something that would come out of my mouth.

(Tr. Vol. 12, at 30:15 - 31:2.) Continuing in his examination, Budlow asks:

> Q. ... When you contacted Strat Security, tell us what you did.
> A. I asked Michael [Cook] to give us a quote on a system they install.

(Id, at 31:22-25.) On his first visit to Adcor, Jeff Price, installation manager at Strat Security (Tr. Vol. 9, at 44), was called Mr. Cook to come down to Adcor to look at the system. (Id, at 45-46.) Hyatt took them on tour because HE wanted to "upgrade" the entire system to one software to control the cameras, security system, and access control. (Id, at 47; Tr. Vol. 10, at 48.)

  On their second visit, Mr. Price and Mr. Cook returned to meet with Michael Hyatt to give him the paperwork and try to "seal the deal." (Tr. Vol. 9, at 54; Vol. 10, at 43.) First, they

discusses the estimates with Hyatt, who then introduced them to Mr. Stavrakis for five minutes. (Tr. Vol. 9, at 80-81.)  Mr. Price and Mr. Cook presented him with the paperwork and made their pitch. (Id, at 80.)  Price explained "how [they] can combine everything as to make it one system, as opposed to three independent systems.  That was it." (Id, at 81.)  Integration of the security systems was merely a matter of purchasing the components from the same manufacturer (id, at 52:13-18), and not an upgrade in of itself.  During the sales pitch Mr. Stavrakis did not ask any questions, sign  any paperwork, nor give Mr. Price the go ahead with the project. (Id, at 80-82.)

   Having got the estimates Mr. Stavrakis directed Hyatt to send them to Goodman. (Tr. Vol. 12, at 35.)  Hyatt sent Goodman the email (dated 9/14/15, Subject: Adcor Security, with a carbon copy to Mr. Stavrakis) with the estimate attached. (Id, at 33-35; see Gov. Exhibit 38.)  In the body of the email, Hyatt wrote, "Randy, these are 'direct replacements' for the security system and camera systems.  They where busted during the clean-up effort.  Let me know how to proceed." (Tr. Vol. 12, at 34.)  Thus, Mr. Stavrakis must have instructed Hyatt to only get proposals for 'direct replacements' because in his email to Goodman Hyatt described the attached estimates as "direct replacements," as required by the insurance policy with travelers and presumably according to Goodman's instructions to Mr. Stavrakis.

   Therefore, because the government did not show any proof that Mr. Stavrakis had any independent knowledge of the physical or operational state of the surveillance  and security system, other than what he may have understood from Ed Cameron's request for the "proposal for new systems," it was clearly erroneous for the district court to have concluded with regards to Court Three that Mr. Stavrakis could have schemed to defraud Travelers or have knowingly participated in a scheme to defraud Travelers.

   In regards to the willful blindness jury instruction, contrary to the government's highly imaginative argument that Mr.. Stavrakis:

> "Set up the dominoes, and then tipped the first one by directing his employee [Hyatt] to obtain the bids for the upgraded and integrated alarm and video surveillance system and submit them to his agent [Goodman], and then hustled to hide behind Hyatt; by doing so [Mr. Stavrakis] deliberately closed his eyes and avoided learning the truth about what he knew would naturally follow--those bids would be fraudulently submitted in an effort to inflate the claims for damage."(Gov.'s Response Brief Doc 41, at 126, paragraph 2.)

   If by analogy the government means to say that the "dominoes" is the scheme to defraud (and assuming such scheme to have existed), then according to that analogy it was by having told Ed Cameron that the security and surveillance systems were not working Mr. Hyatt (or perhaps tony Vega) "tipped the first domino]," and Mr. Stavrakis was merely a domino on down the line who relied on Goodman's representations when he passed Ed Cameron's request for proposal on down to Mr. Hyatt.  Therefore, there was no factual basis to support the court instructing the jury on willful blindness.

   In conclusion, the government produced insufficient evidence to withstand a motion for acquittal regarding Count Three, Wire Fraud, nor to support the jury instruction of willful blindness.  There was no evidence of Appellant having any knowledge of the actual damage to the security and surveillance system, nor knowledge of any scheme to defraud the insurance company.

**ISSUE THREE.** NEWLY DISCOVERED EVIDENCE OF ACTUAL INNOCENCE

A section 2255 motion is allowable when new evidence is discovered after trial, late discovery is not attributable to lack of diligence on the part of the petitioner, the evidence is not merely cumulative or impeaching, the evidence is material, and is likely to produce acquittal. English v. United States, 998 F.2d 609, 611 (8th Cir. 1993).

Regarding the two claims of newly discovered evidence of actual innocence (below), raised in Appellant's Section 2255 motion, the district court did not directly address either claim in its opinion, therefore reasonable double exists whether the court "fully and fairly adjudicated the matter."  Furthermore, proper adjudication of these claims may required additional evidentiary development (see Discovery Request), and the hiring of an expert witness as requested,

A.  For the reasons previously discussed (above), the "missing" masking tape found in the entryway at the foot of the propped open, front office door (see Gov. Exhibit A-1), this newly discovered evidence proves that the arsonist did not enter through the front office doors.  The brown masking tape was found, after the close of all the evidence, in the photograph taken at 4:39am of the front office doors by ATF SA Herb.  Where the tape lay in the entryway beside the open door proves that the arsonist did not enter through the front office door.

B.  In order to convict Mr. Stavrakis of Counts One, Two, and Four, the government was required to prove his guilty knowledge of the arson and his intent (which may be inferred from conduct) to aid another in its accomplishment.

The government centered its case on video surveillance footage capturing Mr. Stavrakis at the front office door taping the latch for the magnetic door lock which bypassed the Brivo card swipe security system.  Only by being able to peer into his thoughts can one know why he taped the latch.  Otherwise his conduct is ambiguous, and can only be explained by events that preceded it or those that followed.

The defense presented evidence explaining that  for some time the front office doors were malfunctioning and because of this Mr. Stavrakis when closing up experienced problems arming the security system, an for these reasons he taped the Brivo latch.  On the other hand, the government points to the fire that occurred the following morning, and which was determined to be arson.  However, to convict Mr. Stavrakis of the arson the government must prove he knew of the planned arson and that he taped the latch to aid the arsonist's entry.

The government believes that by the case presented they proved that the failure of the hard drives containing the video surveillance footage and their subsequent disappearance was not inadvertent, but was a deliberate act done for the purpose of destroying incriminating evidence and thereby establishing Mr. Stavrakis's guilty knowledge of the planed arson and his intent to aid the arsonist's entry through he front office doors.

However, newly discovered evidence establishes that the hard drives did in fact fail, and their inexplicable disappearance was not part of a coverup.  This newly discovered evidence consists of the contents of the DVD containing a copy of the 24 hours of surveillance footage

surrounding the fire at Adcor (see Exhibit 1) and the testimony at contained in the trial transcripts.

The following testimony will show that the jumping around of the video during playback and other anomalies in the video are indicative of physical errors on the surface of the hard disk drive. And by regular and continued use, this normal wear and tear will result in more physical errors until finally the hard drive itself fails.

In its case-in-chief prosecutor Mihok questioned government witness ATF Specialist Steve Greene about the video surveillance footage on the DVD:

> Q. And in addition to .. your analysis of the content of where the files were on the DVD that been provided, did some of these files, when you looked at them, did they appear corrupted or not contain data?
> A. I don't know if "corruption" is the word. It's more, some of the video files did not play. Some played I guess what I would consider sort of normal in motion detected, while other files didn't make sense to me why they played in a certain way, why there's only one frame of video, or why they played a lot of frames of video. (Tr. Vol./ 6, at 119:14-23). And:
> Q. With regard to what you reviewed on September 1st, of 2015, what observations did you make about the video surveillance system, how it was working, how it was operation?
> A. ... [I]t was in motion detection, and it was only, sometimes only a few frames, possibly a frame a second, a couple frames a minute.
> (Tr. Vol. 6, at 121:8-14.)

During the government's examination of its witness ATF Special Agent Lisa Herb prosecutor Mihok questioned her about the video surveillance footage:

> Q. When you were reviewing the video over those ... 40-plus hours you were reviewing it, did yo see gaps in time where the camera seemed to jump from ... either several seconds or [ten, fifteen] or more minutes ahead to another event?
> A. Yes. (Tr. Vol. 5, at 112:16-22.)

Prosecutor Mihok shows her video surveillance footage (dated 7/28/15) captured by front office door security camera 1, and during playback at 8:17am the footage jumps to 8:35am, an 18 minute jump. (Tr. Vol. 5, at 112.) Continuing in his questioning:

> Q. And what would you see when things were happening in the video footage when you saw something like that happen? It went from, just like now from 8:17[am] and then the next footage picked up at approx. 8:35[am]. What were you observing when you [observed jumps like that,] of 17 [or[ 18 [minutes]?
> A. Well, there would be nobody there, no motion or nobody on the video to record. Looks like it picked up when somebody came back into frame, so you could see them walking in or out.
> (Tr. Vol. 5, at 112:23 -113:7.)

During the governments' examination of its witness Edward Thomas, upon playback without explanation the surveillance camera footage jumps from 7:01pm to 7:04pm, and from

7:04pm to 7:48pm. (Tr. Vol. 14, at 187-89; see Gov. Exhibit 1B - video 1C5 playing from 7:01:01pm).

 Defense witness Jeffrey Zwirn, an expert in forensic study of security and video surveillance systems, in his examination he was unable to explain why the video surveillance system recorded still-shot images instead of motion video as it was designed to do, nor could he explain the many other anomalies he was presented.  He did conclude that it was the result of a malfunction between the computer hardware and software and not by sabotage.  During his cross-examination:

> Q.  And ... in your report, one of the problems you note is that there are several videos that were created that appear to be a single frame or just a few frames?
> A.  A single frame of a few frames on a system that's supposed to record, [motion video], not a single frame.  ... To have a fixed frame for no reason is not consistent with normal operating thresholds or parameters.  The problem is we ... have corrupt and other irregularities that are not controllable by anyone but the equipment itself.
>
> (Tr. Vol. 20, at 212:9-20.)  And:
> A.  ... What I will tell you is that the way it's supposed to work is to provide a recording based on video motion, based on things that are programmed into the system.  But it did not do that.
> (Id, at 214:1-14.)  And:
> A.  ... And we see--all of a sudden, for no technical reason, we see it stop, and then we see it go dark, and then we see bands at the bottom.  ...
> (Id, at 213:11-13.)

 In addition to the foregoing testimony describing video errors throughout the 24 hours of footage recorded by twelve surveillance cameras, the following video errors observed by Mr. Zwirn are also typical of the kind found on hard drives containing physical errors on the disk surface:

> "We have have duplicative recordings on different dates, or the same date, in different areas regarding inside the program itself."  (Which is to say that the exact same video footage is purported to have been recorded at different times, or in other instances recorded by different surveillance cameras.)
> (Id, at 215:7-5.)  And:
> "[T]hen you have the problem with the change of the ... frames per second are set [in the software].  ... [Y]ou've got varying frames per second in a system that's supposed to be fixed--"
> (Id, at 221:6-10.)  Mr. Zwirn determined that the video surveillance system could not have been operating according to any parameter designed for the system:
> "[The frames per second] seems to go up, down, stops (sic).  It goes all over the place.  One can change the settings for the number of frames per second at which the video is captured, but that capture rate should remain fixed during playback, and not fluctuate."
> (Id, at 222:11-16.)

The system that housed the hard drives, which referred to at trial as "the serve," was actually a "work station" (Tr. Vol. 19, at 181) (i.e., a desktop PC) running a much older operating system, Windows XP. (Tr. Vol. 6, at 121:15-19)

During his closing argument, regarding the government's theory that the arsonist entered through the front office door, prosecutor Bulow begins by asking the jury:

> "So where's the video? It wasn't copied, or it was deleted or both. The defense will say there's no missing video at that 12:25[am] point because there's no video to be missing. But the problem with that argument is that there are other examples in this case on that disk of videos that you know should be there that isn't there. …" (Tr. Vol. 22, at 62:14-23.)

What the prosecutor here is arguing is, not that the absence of a video of an event that is presumed to have happened is proof that it was deleted, but that the absence of other videos of events known to have happened proves that those videos were deleted, and thus the video of the event that is presumed to have happened was also deleted.

The flaw with this argument is that those missing videos he is referring to of events known to have happened (if in fact were recorded) were of completely innocuous events, which is made apparent from the rest of his argument:

> "And there's two examples of that. One is the morning unlocking of the door. There's no video of that. The other one is Ed Thomas checking the door at 7pm." (Id, at 64:14-23.)

Thus, contrary to the government's argument, here the absence of video of the two events that did happen is not proof that the arsonist came in through the front door.

In the final analysis, the DVD contents are not evidence of a coverup for the defendant's guilt, but wholly to the contrary proof of his innocence. The DVD is all that remains of the failed and lost hard drives, and the contents of which captures the later stages of advanced physically deteriorated hard drives just prior to their failure.

In conclusion, if the defense is granted access to a copy of the contents of this DVD for the analysis by an expert in the internal operations of and interactions among the various software programs and hardware devices that comprise a computer system, who is knowledgeable of the software and hardware used to create the contents of this DVD, said expert would come to the same conclusion and be able to give a technical opinion explaining why the hard drives failed.

**ISSUE FOUR.** INEFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL

Appellant in his Section 2255 motion raised several grounds of ineffective assistance of counsel under the standard established in Strickland v. Washington, 466 U.S. 668 (1984), however, the district court concluded, and in some instances without giving a reason, that Appellant did not establish viable claims. Notwithstanding defense counsels' performance fell well below reasonable competence required for adequate representation failing to perform numerous essential duties, and Appellant was prejudiced thereby:

First, trial counsel failed to object to, and move to strike, prosecutor Budlow's loaded question insinuating that prior arsons have occurred at Adcor.  Second, regarding the newly discovered evidence, trial counsel failed to move for a new trial.  Third, both trial and appellate counsel's inadequate legal arguments and erroneous account of the facts pertaining to Count Three, Wire Fraud, with respect to the motion for acquittal (and renewed motion, and objection to the willful blindness instruction.  Fourth, trial counsel failed to object to a number of improper arguments at closing and on rebuttal.

Fifth, during closing argument, defense counsel Levin's prejudicial remarks referring to Mr. Stavrakis as "otherwise law-abiding," and erroneous account of the facts pertaining to Count Three, Wire Fraud, rendered assistance of counsel ineffective.  Defense counsel's factual account is a follows:

> "You also heard that Ed Cameron met with people at Adcor, specifically not Jimmy [Stavrakis], to discuss getting a bid to replace the system. And as a result of the meeting Mr. Hyatt went to Jimmy and asked if he could get the bid. Jimmy said yes.  Mr. Hyatt go the bids [and] sent them to Randy Goodman..."

(Tr. Vol. 22, at 150:14-23.)  The Mr. Levin went so far as to hand over the case to the government by admitting to the jury Count Three against Mr. Stavrakis:

> "They also tried to replace the security system.  The government just criticized them for not upgrading and not integrating, but's just what they were trying to do under the policy, to protect the property [Adcor]."

(Id, at 157:9-12.)

Sixth, appellate counsel was ineffective in his representation.  While appellate counsel is given the discretion to make the strategic decision of what grounds to raise, instead of pursuing any of the meritous claims raised in the Section 2255 motion he merely appeals the trial court's denial of the motion for acquittal and for new trial.

In his argument, while appellate counsel did not point to any errors of law or facts in the trial court's memorandum finding sufficient evidence, he somehow believed this Court would come to a different result in spite of its deferential review.  The arguments raised in the Section 2255 motion (and here on appeal) are "significant and obvious" and also "clearly stronger" than those raised by appellate counsel which were "nearly doomed to fail." See United States v. Harris, 394 F.3d 543, 557-58 (7th Cir. 2005); United States v. Hicks, 368 F.3d 801, 804-05 (7th Cir. 2004)(stating that "the standard of review for insufficiency claim is daunting.") However, without providing a reason the district court rejected this claim of ineffective assistance. (Opinion at 29.)  Clearly reasonable jurist could find the resolution of these claims debatable.

**RELIEF REQUESTED**

For the foregoing reasons, Appellant requests that this Court grant his Section 2255 motion and vacate the judgement or grant a new trial, which ever is appropriate, and in the alternative grant his request for discovery, for an expert witness, and for an evidentiary hearing.

**PRIOR APPEALS**

Appellant has filed two prior cases with this Court:

**United States v. Stavrakis, 2022 U.S. App. LEXIS 5063 (4th Cir. Feb. 24, 2022)**
**No. 20-4149, No. 20-4184**
**The appeal was denied.**

**United States v. Stavrakis, 2022 U.S. App. LEXIS 9178 (4th Cir. April 5, 2022)**
**No. 20-4149(L), No. 20-4184**
The petition for rehearing and rehearing en banc was *denied*.

Respectfully submitted,

_____
**Demetrios Stavrakis, pro se**


CERTIFICATE OF SERVICE

I, Demetrios Stavrakis, certify that on this 27th day of August, 2024, I sent by first-class mail a copy of this Informal Brief to:

Paul Budlow, AUSA
Office of the United States Attorney
36 South Charles Street
4th floor
Baltimore, MD 21201

_____
Demetrios Stavrakis, pro se